**EXHIBIT B**

DUPLICATE

(USAO GAN 6/10)  Search Warrant

FILED IN CHAMBERS
U.S.D.C. Atlanta

JUN 17 2015

JAMES N. HATTEN, Clerk
By:_____
Deputy Clerk

# United States District Court

## NORTHERN DISTRICT OF GEORGIA

In the Matter of the Search of

Apple iPhone Seized From Mani Chilpayen and currently in the custody of the Superior Court of Fulton County, Georgia

**APPLICATION AND
AFFIDAVIT FOR
SEARCH WARRANT**
Case number: 1:15-MC-678

I, Mario Lijoi, being duly sworn depose and say:

I am a Special Agent of the Drug Enforcement Administration and have reason to believe that in the property described as:

Apple iPhone Seized From Mani Chilpayen and currently in the custody of the Superior Court of Fulton County, Georgia, as described in more detail on Attachment A

in the Northern District of Georgia there is now concealed certain property, certain information, and certain data, namely,

See Attachment B

which constitutes evidence of a crime, contraband, fruits of crime, or items illegally possessed, and property designed for use, intended for use, or used in committing a crime, concerning violations of Title 18, United States Code, Section(s) 1956 & 1957; Title 18, United States Code, Section(s) 1344; Title 18, United States Code, Section(s) 1343; and Title 21, United States Code, Section(s) 841 & 846. The facts to support a finding of Probable Cause are as follows:

SEE ATTACHED AFFIDAVIT

Continued on attached sheet made a part hereof.

Sworn to before me, and subscribed in my presence

_____
Signature of Affiant
Mario Lijoi

June 17, 2015
Date

Atlanta , Georgia
City and States

JANET F. KING
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer
AUSA Garrett L. Bradford

_____
Signature of Judicial Officer

## ATTACHMENT A

### Property to Be Searched

### Apple iPhone Seized From Mani Chilpayen and currently in the custody of the Superior Court of Fulton County, Georgia

A gray Apple iPhone with IMEI #013329001341088, seized from Mani Chilpayen by the Sandy Springs, Georgia Police Department on April 12, 2013, and currently in the custody of the Superior Court of Fulton County, Georgia.

### Property Seized From 1944 Tigertail Boulevard, Dania, Florida And Currently In The Custody Of The Fulton County, Georgia District Attorney's Office

The following property, which was seized from a commercial office suite located at 1944 Tigertail Boulevard, Dania, Florida by the Sandy Springs, Georgia Police Department on April 12, 2013, and currently in the custody of the Fulton County, Georgia District Attorney's Office:

- Miscellaneous hard copy documents, found throughout the office suite

*Seized from the largest office ("Office #1")*

- Silver Apple desktop computer
- Apple iPad with serial number DN6G78R8DKPK
- Blue Citibank bank deposit bag

*Seized from the office adjacent to Office #1 ("Office #2")*

- Silver and black HP Pavilion 20 All-in-One PC desktop computer with serial number 3CR2490MFP

A-1

- Black and red thumb drive which was plugged into the silver and black HP Pavilion 20 All-in-One PC desktop computer with serial number 3CR2490MFP

*Seized from a third office ("Office #3")*

- Silver Apple desktop computer
- Apple iPad with serial number DMPH211XDKPH
- Blue and white thumb drive, 32GB with "PNY" and a key ring
- Black Apple iPhone with IMEI #013328005520788
- Black Samsung laptop computer with serial number HPHF91BC211147N
- Silver WD My Passport for MAC external hard drive with serial number WXQ1A9134809
- File folder labeled "2012 AUDI A7 SILVER VIN: 2816"
- File folder labeled "2011 CHEVY CAMARO RS VIN: 3849"

**Property Seized From 1944 Tigertail Boulevard, Dania, Florida And Currently In The Custody Of The Superior Court Of Fulton County, Georgia**

The following property, which was seized from Office #3 (as described above) located at 1944 Tigertail Boulevard, Dania, Florida by the Sandy Springs, Georgia Police Department on April 12, 2013, and currently in the custody of the Superior Court of Fulton County, Georgia:

- File folder labeled "2012 AUDI A7 WHITE VIN: 3893"

**Property Seized From 2916 Hidden Harbour Court, Dania, Florida**

The following property, which was seized from a residence located at 2916 Hidden Harbour Court, Dania, Florida by the Sandy Springs, Georgia Police Department on April 12, 2013, and currently in the custody of the Fulton County, Georgia Police Department:

- Blue spiral notebook found on kitchen counter
- Black spiral notebook found on kitchen counter
- Silver Apple MacBook Pro laptop computer with serial number W804330GATM found on living room table
- Miscellaneous hard copy documents

## ATTACHMENT B

### Items And Information To Be Seized

Any records relating to the transportation, ordering, distribution, possession and/or sale of controlled substances, including currency and other objects that may be the proceeds of or evidence of drug trafficking, as well as correspondence, financial documents, check stubs, identification documents for individuals, business entities, and assets, or other documents relating to drug trafficking, money laundering, or fraud which constitute evidence of the commission of a criminal offense and property which has been used as the means of committing a criminal offense, concerning violations of 18 U.S.C. §§ 1956 & 1957, 18 U.S.C. § 1344, 18 U.S.C. § 1343, and 21 U.S.C. §§ 841 & 846, including but not limited to:

1. lists of customers and related identifying information;

2. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

3. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

4. information reflecting schedules or appointments;

5. all bank records, checks, credit card bills, account information, and other financial records;

6. records reflecting the purchase or sale of controlled substances, including ledgers, customer lists, supplier lists, correspondence, receipts, journals, books and/or other papers noting the price, quantity or quality of controlled

substances, or noting the person to or from whom locations where controlled substances were obtained, transferred, sold or distributed and/or indicating amounts due or owed on account or transactions;

7. records showing the acquisition, secreting, transfer, and/or concealment of assets and the obtaining, conversion, transfer, concealment, and/or disbursement of currency, currency equivalent, or counterfeit currency, including personal books, records, writings, receipts, insurance records, letters of credit, receipts of customer copies of money drafts, cashier's checks, traveler's checks, wire transfer receipts, bank checks or deposit tickets, safe deposit box agreements, storage facility agreements, and receipts of expenditures;

8. records of warehouse, house or apartment leases, safety deposit box records and storage facility records;

9. records relating to the purchase of large scale business or personal assets including vehicles, furniture, or any other items or receipts reflecting expenditures for personal or business items in excess of $1,000;

10. tax records including income tax returns (Federal, State), real estate and personal property records (city and county), sales tax records (city, county and state), including supporting schedules and work papers, summary sheets, documents and analysis used in the preparation of tax returns and records;

11. loan records, including but not limited to loans payable and receivable documents to include notes, check stubs, payment books, records, loan agreements, loan applications, mortgages, security agreements, deeds of trust, letters of credit, payroll records, and related documents;

12. personal contact and address records, and other items which identify names, nicknames, addresses, telephone numbers, of individuals involved in drug trafficking activities;

13. photographs and videos of individuals involved in drug trafficking, vehicles and other assets, and controlled substances purchased or distributed;

14. documents reflecting the use of fictitious names, addresses, and business fronts, the use of other people's names addresses and businesses, and the dominion and control over assets by the criminal associates placed under someone else's name;

15. records and items indicating occupancy, residency, and/or ownership of premises, including bills, photographs, addressed envelopes, and rent receipts;

16. records reflecting travel, including passports, airline tickets, vehicle rental receipts, credit card receipts, hotel and restaurant receipts, canceled checks, maps, and records of long distance calls; and

17. evidence of user attribution showing who used or owned the device, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

18. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, Mario Lijoi, Special Agent of the Drug Enforcement Administration ("DEA"), being first duly sworn, hereby depose and state as follows:

### Introduction and Affiant's Background

1. I make this affidavit in support of an application for search warrants authorizing the examination of property which is currently in law enforcement or court possession and described in Attachment A (the "Subject Property"), for the items and information described in Attachment B, including the extraction of electronically stored information from electronic devices included in the Subject Property.

2. As explained further below, the Subject Property is currently in law enforcement or court custody, and has been since it was originally seized on April 12, 2013, from three locations: (1) the person of Mani CHILPAYEN, a/k/a Mani Chulpayev, (2) a business office used by CHILPAYEN and his criminal associates, and (3) CHILPAYEN's residence.  This affidavit is based in part on statements CHILPAYEN made to me on June 3, 2015.

3. Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe there is presently concealed in the Subject Property items and information described in Attachment B which constitute evidence, fruits, and/or instrumentalities of, inter alia, violations of 18 U.S.C. §§ 1956 and 1957 (money laundering), 18 U.S.C.

§ 1344 (bank fraud), 18 U.S.C. § 1343 (wire fraud), and 21 U.S.C. §§ 841 & 846 (narcotics trafficking).

4. I am an investigative or law enforcement officer of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations and make arrests for offenses enumerated in Title 18, United States Code, Section 2516.

5. I am a Special Agent with the DEA, and have been so employed for more than seventeen years, since August of 1997. As such, I investigate criminal violations of federal drug laws and related offenses including, but not limited to, violations of Title 21, United States Code, Sections 841, 843, 846, 848, 856, 952, 960, and 963, and Title 18, United States Code, Sections 1952, 1956, 1957 and 1960.

6. Prior to becoming a Special Agent with the DEA, I served as a United States Army National Guard military intelligence analyst assigned to DEA Miami from 1993 through 1997. There, I provided analytical support to DEA's investigations of narcotics trafficking and money laundering organizations.

7. In connection with my official duties as a Special Agent, I attended the DEA academy in Quantico, Virginia, where I received training in the identification of narcotics, the investigation of narcotics traffickers, law enforcement techniques and procedures, and the law of search and seizure. Additionally, I have participated personally in federal investigations that resulted in numerous arrests and seizures concerning drug trafficking, money laundering, and fraud. I have authored the affidavits in support of numerous search and arrest warrants. I have received specialized training in the investigation of drug trafficking

-2-

organizations and their complex conspiracies, including training in drug recognition and terminology, undercover operations, surveillance, interview techniques, financial and money laundering investigations, and the use of electronic surveillance. I am personally familiar with and have used all normal methods of investigation, including but not limited to: visual surveillance; electronic surveillance; interviews of informants, witnesses and subjects; and undercover operations. In addition to this training and experience, I have interviewed dozens of witnesses to, and participants in, large narcotics trafficking organizations who have described to me the techniques that they use to import and distribute illegal drugs as well as to transport, conceal, and launder the proceeds of illegal drug transactions. Further, I have experience in reviewing financial documents and transactions in order to identify fraud-related activity. As part of that process, I have experience in reviewing bank records, financial documents, and credit reports to determine if evidence of money laundering or fraud is present.

8. Based on my training and experience in the investigation of drug traffickers and money launderers, and based upon interviews I have conducted with defendants, informants, and other witnesses and participants in drug trafficking and money laundering activities, I am familiar with the ways in which drug traffickers and money launderers conduct their business. My familiarity includes: the various means and methods by which drug traffickers import and distribute drugs, including their use of cellular telephones and numerical codes and code words to conduct drug transactions. I am also familiar with the ways

that drug traffickers conceal, convert, transmit, and transport their drugs and drug proceeds, including the use of carriers to transport currency and proceeds, the use of third parties to purchase or hold title to assets, the use of multiple vehicles as conveyances for the drugs and drug proceeds, the installation of false/hidden compartments ("traps") in those vehicles to covertly transport drugs and drug proceeds, and the use of off-shore accounts.  In addition, I know that drug trafficking and money laundering organizations such as those under investigation here commonly will compartmentalize members of their organization into discrete "cells," with specific members, responsibilities, and/or geographical territories assigned to each cell.  In that regard, I know that members of one cell commonly are provided with information only about their specific cell's criminal activities, thus limiting the information about the overall organization.

9. As an agent, I have extensive training in the area of narcotics smuggling and money laundering investigations.  Based on my experience and training I know that individuals smuggle and/or transport illegal controlled substances utilizing vehicles.  Often, drug traffickers will reside in one location and store, or "stash" drug supplies in another. While traveling to stash locations, traffickers will often utilize privately owned vehicles.

10. Based on my training and experience, participation in criminal investigations, and the training and experience of other officers and agents with whom I am working closely, I know that:

a. Drug traffickers frequently use cellular telephones and keep a list of names and numbers of customers and suppliers in their electronic address books of their cellular telephones.  Such cell phones will also carry information in a SIM (Subscriber Identity Module) card, or some other type of electronic storage card or drive, which will reveal the number of the cell phone and other information, leading to the identity of the user.

b. Many cell phones currently have advanced capabilities, including: Internet browsing, text and e-mail, photography and video storage, notes, calendars, and data file storage.  I also am aware, through training and experience, that traffickers use cell phones to communicate with each other via voice, direct connect, text message, and e-mail; store valuable data such as names, addresses, and phone numbers of co-conspirators; obtain and store directions and maps; maintain photographs of drug trafficking associates; search the Internet; and capture audio, image, and video files.

c. Furthermore, I know that it is common for drug traffickers to possess and use multiple cell phones to facilitate their unlawful conduct.  Indeed, it is my experience that narcotics distributors purposefully use multiple communication devices so as to not alert law enforcement of the complete scope of their own and/or their organization's illicit conduct, in the event that their communications are being intercepted.  By way of example only, a trafficker may

have one cell phone used to call their drug source of supply, another phone used to call customers, and yet another to call drug distributors, in addition to a phone for personal use. In short, cell phones are vital instruments to drug traffickers.

11. Based on my training and experience, participation in criminal investigations, and the training and experience of other officers and agents with whom I am working closely, I also know that participants in money laundering and fraud schemes will often keep files and other records that reflect their activities, such as records identifying customers, assets, bank accounts, and financial transactions. I also know that such criminals often use electronic devices, including computers, "tablets," and "smart phones" to conduct and store similar records relating to their criminal activities.

## Source Of Information Contained Herein

12. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and upon information that I have developed through personal participation in the underlying investigation. This affidavit also contains information that I have learned from my discussions with other state and federal agents, as well as from interviews and debriefings conducted with cooperating witnesses, written reports of investigations, arrests, and seizures. Because this affidavit is being submitted for the limited purpose of establishing probable cause to support the requested search warrant, I have not included in this affidavit every detail of every aspect of the investigation. Rather,

I have set forth facts which I believe sufficient to establish probable cause for the issuance of the requested search warrant. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, and all times stated in this affidavit are approximate.

## Factual Summary – Probable Cause Basis

### A. Background of the investigation

13. In connection with an investigation into a cocaine, heroin, methamphetamine, and marijuana distribution network operating in the Atlanta metro area, the DEA's High Intensity Drug Trafficking Area ("HIDTA") Task Force in Atlanta identified CHILPAYEN as the leader of a large criminal enterprise that laundered money for a number of narcotics traffickers in the metro Atlanta area. Specifically, CHILPAYEN, together with Amanda ROMANO, Christopher HARRISON, Paul CARRUTH, and Kimberly REISS, operated LUXURY LINEUP LLC, a luxury car leasing business for narcotics traffickers based in Florida. As part of the enterprise, CHILPAYEN and his associates would charge their narcotics trafficker clients large cash down payments and monthly fees while providing the clients with anonymity by keeping the cars registered in the names of business entities or other individuals. Additionally, CHILPAYEN, CARRUTH, and REISS obtained cars for use in their enterprise using a system of straw purchasers, bank fraud, and wire fraud.

CHILPAYEN's enterprise operated in Georgia, Florida, North Carolina, New York, and likely other states.

14. CHILPAYEN was arrested in Florida on April 12, 2013, and charged with murder and other crimes in the Superior Court of Fulton County, Georgia in connection with the June 7, 2012, homicide of Melvin Vernell III, a/k/a Lil Phat (a client of CHILPAYEN's business) outside Northside Hospital in Sandy Springs, Georgia.  On the same day CHILPAYEN was arrested, the Subject Property was seized by Sandy Springs, Georgia Police Department officers pursuant to state search warrants as evidence to be used in the case against CHILPAYEN.  Ultimately, some of the evidence in the case was suppressed when the court held that some of the statements CHILPAYEN made to agents were involuntary,[1] and the murder charges were dismissed when he entered a guilty plea to charges of tampering with evidence on March 30, 2015. CHILPAYEN was subsequently released from custody.

15. In May 2015 this investigation determined that CHILPAYEN had returned to Miami and was operating another vehicle leasing business involving luxury vehicles with his former associate CARRUTH.

---

[1] Some of CHILPAYEN's statements which were later suppressed were included in the applications for the state search warrants authorizing the original search seizure of the Subject Property on April 12, 2013.  In this affidavit I do not rely on any of the statements suppressed in the state case.

-8-

16. On June 3, 2015, CHILPAYEN and CARRUTH met with me and provided statements regarding their past criminal activities, the Subject Property, and information about other criminal actors.

**B. CHILPAYEN's LUXURY LINEUP Car Leasing Criminal Enterprise**

17. The investigation has revealed that CHILPAYEN's LUXURY LINEUP car leasing business was structured as follows:

    a.  CHILPAYEN maintained a fleet of more than 100 vehicles, which he leased out to a clientele that was primarily criminal actors involved in drug trafficking or other criminal activities.

    b.  In order to generate an inventory of vehicles for his leasing business, CHILPAYEN's associates recruited straw purchasers with good credit, including Michael FELMLY, Amelia FELMLY, Lorene MURPHY, Olga HALL, Janet HUNYH, and others.

    c.  In some instances a straw purchaser would go to multiple dealerships where their credit report was pulled to apply for financing. The straw purchaser then bought multiple luxury vehicles in a short period of time and turned them over to CHILPAYEN's LUXURY LINEUP business. It was not until approximately 30 to 45 days later that the financial institutions which financed the vehicle purchases learned that the straw purchaser had actually purchased multiple vehicles from different

sources within a short period of time.[2] By that time, the vehicles had already been transferred to CHILPAYEN's business and leased out to clients, and the financial institutions were unable to locate the vehicles to repossess them when payments were delinquent.

d. CHILPAYEN rented out these vehicles to clients who provided him with a large cash down payment, often approximately 10% of the vehicle's value. Clients then paid a cash monthly fee of $1,000 to $2,000 for continued use of the vehicle. CHILPAYEN sometimes directed clients to make their payments to bank accounts which were held in the name of a third party.

e. When CHILPAYEN leased vehicles to his clients, the vehicles remained registered in the name of one of CHILPAYEN's business entities or straw purchasers. This enabled his clients to prevent their identities from being associated with the vehicles.

f. CHILPAYEN communicated with business associates and clients via text messages, e-mails, and telephone calls using his cellular phones, iPads, and computers.

18. Much of this information about CHILPAYEN's scheme was confirmed during interviews I conducted of ROMANO on February 26 and 27, 2015. ROMANO was CHILPAYEN's girlfriend and also assisted with the operations of LUXURY LINEUP. During these interviews, ROMANO stated:

---

[2] It usually takes a period of time before a car finance loan appears on a person's credit report.

    a.  ROMANO worked at the LUXURY LINEUP business and handled the accounts receivables, vehicle payment transactions, and did other accounting bookwork for the business.

    b.  CHILPAYEN managed approximately 200 vehicles.

    c.  CHILPAYEN's clients were drug dealers, gangsters, and people with low credit scores.

    d.  To lease a car, clients used cash to pay CHILPAYEN approximately 10% of the vehicle's value and made additional monthly cash payments which ranged from $1,000 to $2,000.  Each lease agreement was between 6 and 12 months long.

    e.  CHILPAYEN, CARRUTH, and Lyle LIVESAY normally communicated directly with these clients.

    f.  MURPHY and Olga HALL each provided several vehicles to CHILPAYEN for the LUXURY LINEUP business operations.

    g.  HARRISON and REISS also worked with CHILPAYEN at the LUXURY LINEUP business.

19. Information about CHILPAYEN's scheme was also confirmed during an interview of CHILPAYEN on June 3, 2015.  On that day, CHILPAYEN asked to be interviewed by a federal agent in the hope of becoming a documented confidential source and receiving assistance with resolving immigration issues and pending criminal charges in DeKalb County, Georgia.  I told CHILPAYEN I would listen to what he had to say, but confirmed that he was not a DEA confidential source and I would not make any promises about whether he would

become a documented confidential source or receive any assistance as a result of his statements. CHILPAYEN was not in custody during the meeting, volunteered to be interviewed, and signed a written acknowledgment of Miranda rights during the interview. Among other things, CHILPAYEN stated:

    a.  He rented out approximately 140 vehicles as a part of his enterprise.

    b.  He estimated that approximately 98% of his clients were drug dealers.

    c.  He was in business with CARRUTH, LIVESAY, and REISS.

    d.  ROMANO worked at LUXURY LINEUP as a bookkeeper and handled some of the financial payments for the vehicles.

    e.  HARRISON worked at LUXURY LINEUP picking up and dropping off vehicles and was paid $2,500 per month. HARRISON also leased vehicles to some of his own clients.

    f.  CHILPAYEN obtained cars for his enterprise from third party purchasers, including MURPHY and HALL.

    g.  One of CHILPAYEN's clients, "J.A.," lived in the Atlanta area and sold kilogram quantities of cocaine to distributors operating in the Macon, Georgia area. From 2010 through the time of CHILPAYEN's arrest in April 2013, J.A. leased approximately 10 vehicles from CHILPAYEN. For the first vehicle, J.A. gave CHILPAYEN an initial cash down payment of $15,000 followed by monthly cash lease payments. For subsequent vehicles, J.A. made cash down payments of $3,000 followed by monthly cash lease payments. Since

-12-

CHILPAYEN's recent release from jail, J.A. has been in phone, text, and e-mail contact with CHILPAYEN and currently intends on leasing more vehicles from CHILPAYEN.

h. Another one of CHILPAYEN's clients, "J.P.," lived in the Atlanta area and worked with J.A. selling kilogram quantities of cocaine to distributors operating in the Macon, Georgia area. From 2010 through the time of CHILPAYEN's arrest in April 2013, J.P. leased approximately seven or eight vehicles from CHILPAYEN, changing vehicles approximately every three to five months. For the first vehicle, J.P. gave CHILPAYEN an initial cash down payment of $8,000 followed by monthly cash lease payments of approximately $1,200. For subsequent vehicles, J.P. made cash down payments of $3,000 followed by monthly cash lease payment of $1,200. Since CHILPAYEN's recent release from jail, J.P. has been in phone and text contact with CHILPAYEN and currently intends on leasing more vehicles from CHILPAYEN.

i. One of CHILPAYEN's clients, K.J., distributed narcotics in the Atlanta area and paid CHILPAYEN between $75,000 and $100,000 in cash for multiple vehicles for him and his drug trafficking associates

-13-

over a period of time before CHILPAYEN was arrested in April
2013.[3]

j.  One of CHILPAYEN's clients, "M.M.," distributed narcotics in the
    Atlanta area and paid CHILPAYEN approximately $100,000 in cash
    for vehicles he leased from July 2012 until the time CHILPAYEN
    was incarcerated in April 2013.  During this time M.M. leased
    approximately 30 vehicles, including multiple vehicles
    simultaneously.  The first two vehicles M.M. leased were for M.M.
    and his wife, for which he paid CHILPAYEN a cash down payment
    of $15,000, followed by monthly cash lease payments of $2,400.
    Eventually, at one point, M.M. was leasing approximately seven
    vehicles at a time from CHILPAYEN and the monthly payments to
    CHILPAYEN were $11,000 to $12,000 per month.  Since
    CHILPAYEN's recent release from jail, M.M. has been in e-mail
    contact with CHILPAYEN and currently intends on leasing more
    vehicles from CHILPAYEN.

20. CARRUTH was also present during the June 3, 2015, interview with
CHILPAYEN.  On that day, CARRUTH also asked to be interviewed by a federal
agent in the hope of becoming a documented confidential source, receiving
assistance with resolving pending criminal charges, and being placed into a

---

[3] In June 2014 agents seized four kilograms of cocaine from two individuals
who had just left a house where they met with K.J., and seized 55 kilograms of
marijuana from two cars driving in a four-car caravan including K.J.

witness protection program.  I told CARRUTH I would listen to what he had to say, but confirmed that he was not a DEA confidential source and I would not make any promises about whether he would become a documented confidential source or receive any assistance as a result of his statements.  During this interview, CARRUTH was not in custody, volunteered to be interviewed, and signed a written acknowledgment of Miranda rights during the interview. Among other things, CARRUTH stated that he recruited MURPHY and worked with her and CHILPAYEN to acquire approximately ten vehicles to be used in the LUXURY LINEUP business.

### C. Subject Property Seized From LUXURY LINEUP's Office Suite

21. During the above-described interviews, CHILPAYEN and ROMANO made statements about records that were kept documenting clients, assets, and financial transactions relating to CHILPAYEN's scheme and that those records were stored on or in the Subject Property.  They also confirmed that the office suite located at 1944 Tigertail Boulevard, Dania, Florida, was used by CHILPAYEN, ROMANO, and HARRISON to run the LUXURY LINEUP business and store hard copy and electronic records relating to the enterprise. They identified pictures of the largest office, referred to as "Office #1" in Attachment A, as the office used by CHILPAYEN.  They identified the adjacent office, referred to as Office #2 in Attachment A, as the office used by ROMANO. They identified a third office, referred to as Office #3 in Attachment A, as the office used by HARRISON.

22. For example, ROMANO stated that:

a. ROMANO worked at the LUXURY LINEUP business and handled the accounts receivables, vehicle payment transactions, and did other accounting bookwork for the business.

b. ROMANO generated weekly Excel spreadsheets which she sent to CHILPAYEN at his e-mail address, maninyc777@gmail.com. CHILPAYEN used his computer, iPhone, and iPad to view these spreadsheets.

c. CHILPAYEN kept hard copy files on his vehicles in cabinets inside the LUXURY LINEUP office. These files included signed lease agreements, copies of clients' driver's licenses, and copies of insurance for the vehicles.

d. ROMANO kept paper documents related to the business in her office. She also kept electronic records, including Excel spreadsheets, on a desktop computer in her office. The spreadsheets contained information related to vehicle owners, monthly payments, banking, and other information.

e. HARRISON handled much of the advertising for LUXURY LINEUP, and may have kept contracts and lease agreements on the computer in his office.

23. ROMANO also identified several computers, other electronic media, vehicle files, business records, and other items included in the Subject Property. For example:

a. ROMANO identified photographs taken of CHILPAYEN's office (Office #1) which included an Apple computer and a blue Citibank bank deposit bag.  ROMANO sated that CHILPAYEN kept e-mails, lease agreements, and photos on this computer, and kept money, checks, and deposit slips for the business in the blue Citibank moneybag.

b. ROMANO identified photographs of a filing cabinet containing vehicle files in a storage area of the office suite.

c. ROMANO identified photographs taken of her office (Office #2) which included an HP desk computer.[4]

d. ROMANO identified photographs taken of HARRISON's office (Office #3) which included a filing cabinet, an Apple computer, an iPad, a thumb drive, an external hard drive, an iPhone, and a black laptop computer which was on the floor.  ROMANO stated that HARRISON may have kept contracts, lease agreements, and vehicle photos on his computer and that the filing cabinet contained individual vehicle files which were organized and labelled with partial vehicle identification numbers ("VINs").

---

[4] ROMANO identified a picture of the silver and black HP Pavilion All-in-one PC desktop computer (included in the Subject Property) which ROMANO used when employed at LUXURY LINEUP, and signed a written consent for agents to search that computer.

24. CHILPAYEN also confirmed that he kept records documenting clients, assets, and financial transactions relating to LUXURY LINEUP in the office suite and identified pictures of the Subject Property taken on April 12, 2013, when the Subject Property was seized by agents.  For example:

   a. CHILPAYEN identified photographs taken of his office (Office #1) which included an Apple computer and a blue Citibank bank deposit bag.  CHILPAYEN stated his laptop and iPad were kept inside a bag which was visible on the floor in photographs.

   b. CHILPAYEN identified photographs taken of ROMANO's office (Office #2) which included an HP desk computer.  CHILPAYEN stated ROMANO made vehicle payments and maintained the LUXURY LINEUP financial bookkeeping.

   c. CHILPAYEN identified photographs taken of HARRISON's office (Office #3) which included a filing cabinet filled with file folders with partial VINs on them, an Apple computer, an iPad, a thumb drive, an external hard drive, an iPhone, and a black laptop computer on the floor.  CHILPAYEN stated the files in the cabinet were the vehicle files for the business which contained the contracts and other information.

**D. Subject Property Seized From CHILPAYEN And ROMANO's Residence**

25. During the above-described interviews, CHILPAYEN and ROMANO also confirmed that he lived at the residence located at 2916 Hidden Harbour Court, Dania, Florida, and that HARRISON also lived in a room in the residence.  They

-18-

further confirmed that records relating to the LUXURY LINEUP enterprise were stored in that location, and identified pictures of the Subject Property from April 12, 2013.

26. For example:

    a. CHILPAYEN identified two notebooks (the two spiral notebooks included in the Subject Property) displayed in a photograph of the kitchen counter in his residence as notebooks ROMANO used to keep track of LUXURY LINEUP business expenses.

    b. CHILPAYEN identified a silver Apple laptop computer (the silver Apple MacBook Pro laptop computer included in the Subject Property) displayed in a photograph of a dining room table in the residence and stated that it belonged to him.

    c. CHILPAYEN identified photographs of marijuana, drug paraphernalia, and scales which were found in the kitchen at his residence and stated he and ROMANO smoked marijuana for recreational use.

    d. CHILPAYEN identified photographs of his master bedroom and bathroom which displayed a bag of marijuana which was found on the master bathroom counter.

27. ROMANO also identified photographs taken on April 12, 2013, of the residence located at 2916 Hidden Harbour Court, Dania, Florida. She stated that she and CHILPAYEN lived at that residence. She stated that marijuana found in

the master bathroom of her residence belonged to her and that marijuana, drug paraphernalia, and scales found in the kitchen belonged to her and HARRISON.

### E. The iPhone Seized From CHILPAYEN On April 12, 2013

28. When CHILPAYEN was arrested on April 12, 2013, on homicide charges filed in Fulton County, Georgia, he had on his person a gray Apple iPhone with IMEI #013329001341088.

29. I believe that CHILPAYEN's iPhone contains evidence of his criminal enterprise. For example, during the June 3, 2015, interview, CHILPAYEN stated that he used his phone to send text messages to clients about cars and to check his email. Further, as noted above in paragraph 22(b), ROMANO stated that CHILPAYEN used his iPhone to view records relating to the LUXURY LINEUP enterprise, specifically, the weekly spreadsheets ROMANO prepared and emailed to CHILPAYEN. Additionally, a DEA Source of Information ("SOI #8) stated that s/he participated in voice calls and text message communications with CHILPAYEN about vehicle transactions, sometimes including photographs and VINs for the vehicles, prior to CHILPAYEN's arrest in April 2013.[5]

---

[5] SOI #8 provided agents with three separate phone numbers used by CHILPAYEN over time. Agents believe SOI #8 is an accurate and reliable source of information. SOI #8 has cooperated with agents over a period of time in exchange for assistance with resolving criminal charges that were pending in New Jersey and Georgia.

## Technical Terms

30. Based on my training and experience and consultation with others, I use the following technical terms to convey the following meanings:

    a.  Cell phone or Wireless Telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

    b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital

cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

d.  GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can

-22-

contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

e.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For

example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

f.  Tablet: A tablet is a mobile computer, typically larger than a phone yet smaller than a notebook, that is primarily operated by touching the screen. Tablets function as wireless communication devices and can be used to access the Internet through cellular networks, 802.11 "wi-fi" networks, or otherwise. Tablets typically contain programs called apps, which, like programs on a personal computer, perform different functions and save data associated with those functions. Apps can, for example, permit accessing the Web, sending and receiving e-mail, and participating in Internet social networks.

g.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h. Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

31. Based on my training, experience, and research, and consultation with others, I know that the iPhones included in the Subject Property have capabilities that allow them to serve as wireless telephones, digital cameras, portable media players, GPS navigation devices, and PDAs; I know that the iPads included in the Subject Property are tablets which have capabilities that may allow them to serve as communication devices, digital cameras, portable media players, GPS navigation devices, and PDAs; and I know that the laptop and desktop computers included in the Subject Property have capabilities that may allow them to serve as communication devices and digital cameras. In my training and experience, examining data stored on these types of devices and computers can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

### Electronic Storage And Forensic Analysis

32. Based on my knowledge, training, and experience, and consultation with others, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored

for some period of time on the devices. This information can sometimes be recovered with forensics tools.

33. As to the electronic devices included in the Subject Property, there is probable cause to believe that things that were once stored on that device may still be stored there, for at least the following reasons:

> a. Based on my knowledge, training, and experience, and consultation with others, I know that electronic files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost. Even when files have been deleted, they can be recovered months or years later using forensic tools. This is so because when a person "deletes" a file on an electronic device, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

> b. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space — that is, in space on the storage medium that is not currently being used by an active file — for long periods of time before they are overwritten. In addition, an electronic device's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, electronic storage media—in particular, electronic devices' internal hard drives—contain electronic evidence of how an electronic device has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Electronic device users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

34. *Forensic evidence*.  This application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the electronic devices were used, the purpose of their use, who used them, and when.  There is probable cause to believe that this forensic electronic evidence might be on the electronic devices because:

a.  Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been

-27-

deleted from a word processing file).  Further, as to electronic devices, virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active.  Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords.  Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b.  Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process.  Electronic evidence is not always

data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

35. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrants I am applying for would permit the examination of the devices consistent with the warrants. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrants.

36. *Manner of execution.* Because the requested warrants seek only permission to examine devices already in law enforcement or a court's possession, the execution of the warrants does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrants at any time in the day or night.

## Conclusion

37. Based on the above, I believe that that there is probable cause for search warrants authorizing the examination of the Subject Property, as described in Attachment A, for the items described in Attachment B, which constitute evidence, instrumentalities, and fruits of violations of 18 U.S.C. §§ 1956 and 1957 (money laundering), 18 U.S.C. § 1344 (bank fraud), 18 U.S.C. § 1343 (wire fraud), and 21 U.S.C. §§ 841 & 846 (narcotics trafficking).

## Sealing Request

IT IS FURTHER REQUESTED that the search warrants, supporting applications, affidavits, and associated pleadings be filed UNDER SEAL until further order of the Court to avoid premature disclosure of the ongoing undercover investigation, guard against flight, avoid the destruction of evidence, avoid the intimidation of witnesses, and better ensure the safety of agents and others, except that working copies may be served on Special Agents and other investigative and law enforcement officers of the DEA, federally deputized state and local law enforcement officers, and other government and contract personnel acting under the supervision of such investigative or law enforcement officers, as necessary to effectuate the Court's Order.

## ATTACHMENT A

### Property to Be Searched

### Apple iPhone Seized From Mani Chilpayen and currently in the custody of the Superior Court of Fulton County, Georgia

A gray Apple iPhone with IMEI #013329001341088, seized from Mani Chilpayen by the Sandy Springs, Georgia Police Department on April 12, 2013, and currently in the custody of the Superior Court of Fulton County, Georgia.

### Property Seized From 1944 Tigertail Boulevard, Dania, Florida And Currently In The Custody Of The Fulton County, Georgia District Attorney's Office

The following property, which was seized from a commercial office suite located at 1944 Tigertail Boulevard, Dania, Florida by the Sandy Springs, Georgia Police Department on April 12, 2013, and currently in the custody of the Fulton County, Georgia District Attorney's Office:

- Miscellaneous hard copy documents, found throughout the office suite

*Seized from the largest office ("Office #1")*

- Silver Apple desktop computer
- Apple iPad with serial number DN6G78R8DKPK
- Blue Citibank bank deposit bag

*Seized from the office adjacent to Office #1 ("Office #2")*

- Silver and black HP Pavilion 20 All-in-One PC desktop computer with serial number 3CR2490MFP

A-1

- Black and red thumb drive which was plugged into the silver and black HP Pavilion 20 All-in-One PC desktop computer with serial number 3CR2490MFP

*Seized from a third office ("Office #3")*

- Silver Apple desktop computer

- Apple iPad with serial number DMPH211XDKPH

- Blue and white thumb drive, 32GB with "PNY" and a key ring

- Black Apple iPhone with IMEI #013328005520788

- Black Samsung laptop computer with serial number HPHF91BC211147N

- Silver WD My Passport for MAC external hard drive with serial number WXQ1A9134809

- File folder labeled "2012 AUDI A7 SILVER VIN: 2816"

- File folder labeled "2011 CHEVY CAMARO RS VIN: 3849"


**Property Seized From 1944 Tigertail Boulevard, Dania, Florida And Currently In The Custody Of The Superior Court Of Fulton County, Georgia**

The following property, which was seized from Office #3 (as described above) located at 1944 Tigertail Boulevard, Dania, Florida by the Sandy Springs, Georgia Police Department on April 12, 2013, and currently in the custody of the Superior Court of Fulton County, Georgia:

- File folder labeled "2012 AUDI A7 WHITE VIN: 3893"

**<u>Property Seized From 2916 Hidden Harbour Court, Dania, Florida</u>**

The following property, which was seized from a residence located at 2916 Hidden Harbour Court, Dania, Florida by the Sandy Springs, Georgia Police Department on April 12, 2013, and currently in the custody of the Fulton County, Georgia Police Department:

- Blue spiral notebook found on kitchen counter
- Black spiral notebook found on kitchen counter
- Silver Apple MacBook Pro laptop computer with serial number W804330GATM found on living room table
- Miscellaneous hard copy documents

## ATTACHMENT B

### Items And Information To Be Seized

Any records relating to the transportation, ordering, distribution, possession and/or sale of controlled substances, including currency and other objects that may be the proceeds of or evidence of drug trafficking, as well as correspondence, financial documents, check stubs, identification documents for individuals, business entities, and assets, or other documents relating to drug trafficking, money laundering, or fraud which constitute evidence of the commission of a criminal offense and property which has been used as the means of committing a criminal offense, concerning violations of 18 U.S.C. §§ 1956 & 1957, 18 U.S.C. § 1344, 18 U.S.C. § 1343, and 21 U.S.C. §§ 841 & 846, including but not limited to:

1. lists of customers and related identifying information;

2. types, amounts, and prices of drugs trafficked as well as dates, places, and amounts of specific transactions;

3. any information related to sources of drugs (including names, addresses, phone numbers, or any other identifying information);

4. information reflecting schedules or appointments;

5. all bank records, checks, credit card bills, account information, and other financial records;

6. records reflecting the purchase or sale of controlled substances, including ledgers, customer lists, supplier lists, correspondence, receipts, journals, books and/or other papers noting the price, quantity or quality of controlled

substances, or noting the person to or from whom locations where controlled substances were obtained, transferred, sold or distributed and/or indicating amounts due or owed on account or transactions;

7. records showing the acquisition, secreting, transfer, and/or concealment of assets and the obtaining, conversion, transfer, concealment, and/or disbursement of currency, currency equivalent, or counterfeit currency, including personal books, records, writings, receipts, insurance records, letters of credit, receipts of customer copies of money drafts, cashier's checks, traveler's checks, wire transfer receipts, bank checks or deposit tickets, safe deposit box agreements, storage facility agreements, and receipts of expenditures;

8. records of warehouse, house or apartment leases, safety deposit box records and storage facility records;

9. records relating to the purchase of large scale business or personal assets including vehicles, furniture, or any other items or receipts reflecting expenditures for personal or business items in excess of $1,000;

10. tax records including income tax returns (Federal, State), real estate and personal property records (city and county), sales tax records (city, county and state), including supporting schedules and work papers, summary sheets, documents and analysis used in the preparation of tax returns and records;

11. loan records, including but not limited to loans payable and receivable documents to include notes, check stubs, payment books, records, loan agreements, loan applications, mortgages, security agreements, deeds of trust, letters of credit, payroll records, and related documents;

12. personal contact and address records, and other items which identify names, nicknames, addresses, telephone numbers, of individuals involved in drug trafficking activities;

13. photographs and videos of individuals involved in drug trafficking, vehicles and other assets, and controlled substances purchased or distributed;

14. documents reflecting the use of fictitious names, addresses, and business fronts, the use of other people's names addresses and businesses, and the dominion and control over assets by the criminal associates placed under someone else's name;

15. records and items indicating occupancy, residency, and/or ownership of premises, including bills, photographs, addressed envelopes, and rent receipts;

16. records reflecting travel, including passports, airline tickets, vehicle rental receipts, credit card receipts, hotel and restaurant receipts, canceled checks, maps, and records of long distance calls; and

17. evidence of user attribution showing who used or owned the device, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

18. As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.

FILED IN CHAMBERS
U.S.D.C. Atlanta

JUN 17 2015

JAMES N. HATTEN, Clerk
By: ~~~~~~~ Deputy Clerk

(USAO GAN 6/10) Search Warrant

**DUPLICATE**

# United States District Court

## NORTHERN DISTRICT OF GEORGIA

In the Matter of the Search of

Apple iPhone Seized From Mani Chilpayen and currently in
the custody of the Superior Court of Fulton County,
Georgia

**SEARCH WARRANT**
Case number: 1:15-MC-678

TO: Special Agent Mario Lijoi, and any Authorized Officer of the United States

Affidavit(s) having been made before me by Mario Lijoi who has reason to believe that in the property
described as:

Apple iPhone Seized From Mani Chilpayen and currently in the custody of the Superior Court of
Fulton County, Georgia, as described in more detail on Attachment A,

in the Northern District of Georgia there is now concealed certain property, certain information, and
certain data, namely,

See Attachment B,

which constitutes evidence of a crime, contraband, fruits of crime, or items illegally possessed, and
property designed for use, intended for use, or used in committing a crime, concerning violations of Title
18, United States Code, Section(s) 1956 & 1957; Title 18, United States Code, Section(s) 1344; Title 18,
United States Code, Section(s) 1343; and Title 21, United States Code, Section(s) 841 & 846.  I find that the
affidavit(s) establishes probable cause to search for and seize the certain property, certain information,
and certain data from the property described above.

YOU ARE HEREBY COMMANDED to execute this warrant on or before _July 1, 2015_ (not to
exceed 14 days) AT ANY TIME IN THE DAY OR NIGHT AS I FIND GOOD CAUSE HAS BEEN
ESTABLISHED.  You must give a copy of the warrant and a receipt for the property taken to the person
from whom, or from whose premises, the property was taken, or leave a copy of the warrant and receipt
at the place where the property was taken. The officer executing the warrant, or an officer present during
the execution of the warrant, must prepare an inventory as required by law and promptly return this
warrant and inventory to United States Magistrate Judge Janet F. King.

June 17, 2015 at _2:55 pm_                    at _Atlanta_, Georgia
Date and Time Issued                          City and States

JANET F. KING
UNITED STATES MAGISTRATE JUDGE
Name and Title of Judicial Officer            Signature of Judicial Officer
AUSA Garrett L. Bradford